UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEB, INC., a California Corporation,<br><br>                                     *Plaintiff,*<br><br>               *vs.*<br><br>PREMIUM MERCHANT FUNDING 26, LLC, MASON G. KASHAT, JAMES P. GIESELMANN, JR. and ADELA BEJKO,<br><br>                                     *Defendants.* | Civil Action No. 1:24-cv-8791<br><br><br>**COMPLAINT** |

Plaintiff PEB, Inc., by and through its attorneys, Reynolds Law Group LLC, by way of Complaint against Defendants Premium Merchant Funding 26, LLC, Mason G. Kashat, James P. Gieselmann, Jr. and Adela Bejko, alleges as follows:

### THE PARTIES

1.      PEB, Inc. ("PEB") is a corporation organized and existing under the law of the State of California and has its principal place of business in California.

2.      Upon information and belief, Premium Merchant Funding 26, LLC ("PMF") is a corporation organized under the laws of the State of Delaware and maintains a principal place of business at 55 Water Street, 50th Floor, New York, NY 10041.

3.      Upon information and belief, Mason G. Kashat ("Kashat") is an individual who resides in the State of New York and is employed by PMF.

4.      Upon information and belief, James P. Gieselmann, Jr. ("Gieselmann") is an individual who resides in the State of New Jersey and is employed by PMF.

5.      Upon information and belief, Adela Bejko ("Bejko," together with Gieselmann and Kashat, the "Individual Defendants") is an individual who resides in the State of

New York and is employed by PMF.  PMF and the Individual Defendants are collectively referred to as "Defendants."

## PRELIMINARY STATEMENT

6.      This is a RICO action against defendants who participated in the operation of a merchant cash advance ("MCA") company that engages in loansharking schemes, collected unlawful debt and otherwise fraudulently and unlawfully obtained millions of dollars in usurious interest from PEB.

7.      From October 17, 2023 to January 22, 2024, PMF entered into at least eight (8) "Merchant Agreements" with PEB pursuant to which PMF purportedly paid certain amounts to purchase a percentage of PEB's future receivables at a discount.

8.      Under the arrangements, PMF was required to make daily or weekly payments of a fixed sum from a designated PEB depository account until the "Purchased Amount" was paid in full.  Although described as the purchase of future receivables, these arrangements were in fact high-interest loans for which PMF demanded guaranteed repayment, in fixed installments, on a fixed term and not dependent on the realization of PEB's receivables.

9.      Critically, unlike a bona fide purchase of receivables, the risk of non-payment never transferred to PMF.  Through a series of unconscionable and one-sided contractual provisions contained within the sham Merchant Agreements, at all times, PMF was absolutely entitled to repayment under all circumstances.

10.      The Merchant Agreements charged interest far in excess of the maximum 25% allowed under New York's usury laws – even on their face up to 150% or six (6) times the maximum rate of interest permitted under New York law.  In reality, the effective interest rates

were often much higher after consideration of outrageous fees assessed by PMF and the timing of advances made to PEB.

11.     The amount of money illegally obtained from PEB by Defendants through their loansharking enterprise is staggering.  In less than one year, PMF received nearly $3 million in usurious interest on loan proceeds of only approximately $2.4 million.

12.     PEB brings this action to recover substantial damages sustained by Defendants' confederation of an unlawful RICO enterprise to make and collect on the unlawful usurious loans.

## JURISDICTION AND VENUE

13.     Each defendant is subject to the personal jurisdiction of this Court because each defendant regularly transacts business within the State of New York, has purposely availed itself of the laws of New York for the specific transaction at issue, or has selected New York as the forum for disputes related to this transaction.

14.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").

15.     The Court has original jurisdiction based on 28 U.S.C. § 1332(a) because the Plaintiff is not a citizen of the same state as a Defendant and the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

17.     Defendants' agreements contain applicable choice of law and venue provisions that specify that the agreements shall be governed by the laws of State of New York and

that any action arising under the agreements shall be instituted in "in a state or federal court located in the State and City of New York."

## <u>FACTUAL ALLEGATIONS</u>

18.    PEB is a specialty contractor of industrial power plants in the State of California.

19.    Like many businesses, PEB sustained a slowdown in its business operations due to the effects of the Global Coronavirus Disease (Covid-19) Pandemic.

20.    In 2022 and 2023, PEB's business had materially slowed, but its owner, Harley Padilla, was determined to retain his employees and avoid mass layoffs experienced by numerous other small businesses.

21.    By 2023, PEB's business had continued to slow, so it looked for short-term financing as a "bridge" to make it through what would end up being the waning days of the pandemic.

22.    In or around May 2023, PMF representatives made contact with PEB.

23.    According to PMF's website, its "goal is to build a strong working relationship in order to help small businesses stay competitive and grow by providing revolving financing as needed until the business can improve its credit and quality for a traditional loan.

24.    Among the types of financial products and services sold by PMF are lines of credit, equipment financing, mortgage financing, term loans, factoring and merchant cash advances.

25.    Upon information and belief, while offering some legitimate financial products, PMF also utilizes a staff of sales officers and brokers to identify, sell, underwrite and

fund usurious loans to distressed small businesses that are in immediate need of short-term working capital.

26.     PMF employees involved in the sale of usurious loans are compensated by commissions and other revenue-sharing incentives based on the value of each transaction.

27.     Although PMF markets itself as a purveyor of Merchant Cash Advance and Factoring services, the "Merchant Agreements" developed and utilized by PMF are actually loan agreements charging per annum interest rates more than twice the amount prohibited by New York's usury laws.

28.     PMF falsely markets these usurious loans as an alternative to traditional financing, not having an annual percentage rate ("APR") and providing a sound solution to businesses in need of short-term working capital until financial conditions improve and traditional financing at lower interest rates becomes available.

29.     In reality, PMF has no intention of assisting businesses with obtaining long-term, traditional loans at low interest rates.  Rather, PMF preys on distressed businesses and unsophisticated business owners who are desperate for working capital to operate struggling businesses.

30.     Ultimately, PMF's goal is to keep each business barely solvent by trapping it in a cycle of high-interest, short-term loans.  As the cycle continues, an ever-larger percentage of revenue is needed to cover the high-interest and exorbitant fees, requiring the merchant to pay down each existing cash advance with yet another cash advance, thereby trapping the merchant in a cycle of crushing debt from which it cannot escape except by way of default.

31.     In a matter of weeks and/or months, the business is transformed into a "zombie" company, existing merely to pay usurious interest and outrageous fees to PMF.  It is

PMF's goal to syphon as much money out of the merchant as possible before its inevitable collapse under the weight of the crushing debt obligations imposed by PMF's usurious interest rates and fraudulent fees untethered to any actual costs incurred by PMF.

32.    When the business inevitably defaults under the weight of the daily or weekly payments and can no longer service the debt, PMF then uses draconian and unconscionable rights and remedies granted to it under the Merchant Agreement to collect from the business owner under, *inter alia*, a personal guaranty and through a confession of judgment against the guarantor and merchant.

### THE TRANSACTIONS

33.    Between October 17, 2023 and January 22, 2024, PEB entered into at least eight (8) Merchant Agreements with PMF pursuant to which PEB paid approximately $3 million in interest on advances of only approximately $2.4 million.

### A.    The Merchant Agreements

### 1.    The October 17, 2023 Merchant Agreement

34.    On October 17, 2023, PEB and PMF entered into a Merchant Agreement (the "October 17, 2023 Agreement"). Under the October 17, 2023 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $461,285.36, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

35.    The October 17, 2023 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there be an "Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the

Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

36.    Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

37.    The October 17, 2023 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the October 17, 2023 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

38.    However, the October 17, 2023 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $13,217.60 per week, to be remitted in the form of weekly Automated Clearing House ("ACH") withdrawals from PEB's operating account. Thus, the October 17, 2023 Agreement expressly contemplated 52 payments in the amount of $13,217.60 per week, for a total of $461,285.36. The October 17, 2023 Agreement described the $13,217.60 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

39.    The October 17, 2023 Agreement also included a one-time "Underwriting Fee" of $43,133.54, which, upon information and belief, bore no relation to actual expenses

incurred by PMF's underwriters. In actuality, the Underwriting Fee was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

40.    PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

41.    Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing was a fraction of the amounts charged. Instead, these fees were merely additional disguised interest.

42.    Thus, in reality, the October 17, 2023 Agreement was a loan of $461,285.36 that required repayment of $687,315.19 in just 52 weeks and payable in fixed weekly installments. This translated into an annual interest rate in excess of 50%. Thus, on its face, the loan contained an interest rate approximately two (2) times greater than the 25% maximum per annum interest rate permitted under New York law.

43.    Upon information and belief, PMF's intent in executing the October 17, 2023 Agreement was to make a loan requiring repayment of a fixed installment that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment may be made. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timeline of payment by PEB's account debtors.

44. PMF did not advance the entire Purchase Price in a lump sum. Instead, PMF advanced the funds in several tranches, thereby increasing the effective interest rate.

45. By revising the Specified Percentage of PEB's receivables to a fixed amount of $27,125 per week, the October 17, 2023 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term. Although the October 17, 2023 Agreement purported to give PEB the option to request a reconciliation to ensure the amounts remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF. At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB. At no time was PMF under an obligation to grant a reconciliation request.

46. The October 17, 2023 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Harley Padilla to personally guarantee PEB's performance under the agreement.

## 2. The October 25, 2023 Merchant Agreement

47. On October 25, 2023, PEB and PMF entered into a Merchant Agreement (the "October 25, 2023 Agreement"). Under the October 25, 2023 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $250,000, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

48. The October 25, 2023 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there be an "Event

of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

49.     Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

50.     The October 25, 2023 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the October 25, 2023 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

51.     However, the October 25, 2023 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $21,527.78 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the October 25, 2023 Agreement expressly contemplated 18 payments in the amount of $21,527.78 per week, for a total of $387,500. The October 25, 2023 Agreement described the $21,527.78 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

52.     The October 25, 2023 Agreement also included a one-time "Underwriting Fee" of $21,527.78, which, upon information and belief, bore no relation to actual expenses

incurred by PMF's underwriters. In actuality, the Underwriting Fee was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

53.    PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

54.    Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing was a fraction of the amounts charged. Instead, these fees were merely additional disguised interest.

55.    Thus, in reality, the October 25, 2023 Agreement was a loan of $250,000 that required repayment of $387,500 in just 18 weeks and payable in fixed weekly installments. This translated into an annual interest rate of approximately 158%. Thus, on its face, the loan contained an interest rate approximately six (6) times greater than the 25% maximum per annum interest rate permitted under New York law.

56.    Upon information and belief, PMF's intent in executing the October 25, 2023 Agreement was to make a loan requiring repayment of a fixed installment that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment may be made. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timeline of payment by PEB's account debtors.

57.     PMF did not advance the entire Purchase Price in a lump sum.  Instead, PMF advanced the funds in several tranches, thereby increasing the effective interest rate.

58.     By revising the Specified Percentage of PEB's receivables to a fixed amount of $21,527.78 per week, the October 25, 2023 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the October 25, 2023 Agreement purported to give PEB the option to request a reconciliation to ensure the amounts remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

59.     The October 25, 2023 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

### 3.     The November 6, 2023 Merchant Agreement

60.     On November 6, 2023, PEB and PMF entered into a Merchant Agreement (the "November 6, 2023 Agreement").  Under the November 6, 2023 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $750,000, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

61.     The November 6, 2023 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there be an "Event

of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

62.     Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

63.     The November 6, 2023 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the November 6, 2023 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

64.     However, the November 6, 2023 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $83,035.71 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the November 6, 2023 Agreement expressly contemplated 14 payments in the amount of $83,035.71 per week, for a total of $1,162,500. The November 6, 2023 Agreement described the $83,035.71 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

65.     The November 6, 2023 Agreement also included a one-time "Underwriting Fee" of $75,000, which, upon information and belief, bore no relation to actual expenses incurred

by PMF's underwriters.  In actuality, the Underwriting Fee was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

66.     PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

67.     Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing was a fraction of the amounts charged.  Instead, these fees were merely additional disguised interest.

68.     Thus, in reality, the November 6, 2023 Agreement was a loan of $750,000 that required repayment of $1,162,500 in just 14 weeks and payable in fixed weekly installments.  This translated into an annual interest rate of approximately 203%.  Thus, on its face, the loan contained an interest rate approximately eight (8) times greater than the 25% maximum per annum interest rate permitted under New York law.

69.     Upon information and belief, PMF's intent in executing the November 6, 2023 Agreement was to make a loan requiring repayment of a fixed installment that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment may be made.  Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timeline of payment by PEB's account debtors.

70.     PMF did not advance the entire Purchase Price in a lump sum.  Instead, PMF advanced the funds in several tranches, thereby increasing the effective interest rate.

71.     By revising the Specified Percentage of PEB's receivables to a fixed amount of $83,035.71 per week, the November 6, 2023 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the November 6, 2023 Agreement purported to give PEB the option to request a reconciliation to ensure the amounts remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

72.     The November 6, 2023 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

**4.      The November 22, 2023 Merchant Agreement**

73.     On November 22, 2023, PEB and PMF entered into a Merchant Agreement (the "November 22, 2023 Agreement").  Under the November 22, 2023 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $350,000, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

74.     The November 22, 2023 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there

be an "Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

75.    Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

76.    The November 22, 2023 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the November 22, 2023 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

77.    However, the November 22, 2023 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $27,125 per week, to be remitted in the form of weekly ACH withdrawals. Thus, the November 22, 2023 Agreement expressly contemplated 20 payments in the amount of $27,125 per week, for a total of $542,500. The November 22, 2023 Agreement described the $27,125 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

78.    The November 22, 2023 Agreement also included a one-time "Underwriting Fee" of $35,000, which, upon information and belief, bore no relation to actual expenses incurred by PMF's underwriters. In actuality, the Underwriting Fee was merely more

usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

79.     PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

80.     Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing was a fraction of the amounts charged.  Instead, these fees were merely additional disguised interest.

81.     Thus, in reality, the November 22, 2023 Agreement was a loan of $350,000 that required repayment of $542,500 in just 20 weeks and payable in fixed weekly installments.  This translated into an annual interest rate of approximately 130%.  Thus, on its face, the loan contained an interest rate approximately five (5) times greater than the 25% maximum per annum interest rate permitted under New York law.

82.     Upon information and belief, PMF's intent in executing the November 22, 2023 Agreement was to make a loan requiring repayment of a fixed installment that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment may be made.  Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timeline of payment by PEB's account debtors.

83.    PMF did not advance the entire Purchase Price in a lump sum.  Instead, PMF advanced funds in several tranches, thereby increasing the effective interest rate.

84.    By revising the Specified Percentage of PEB's receivables to a fixed amount of $27,125 per week, the November 22, 2023 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the November 22, 2023 Agreement purported to give PEB the option to request a reconciliation to ensure the amounts remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

85.    The November 22, 2023 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

**5.    The December 12, 2023 Merchant Agreement**

86.    On December 12, 2023, PEB and PMF entered into a Merchant Agreement (the "December 12, 2023 Agreement").  Under the December 12, 2023 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $125,000, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

87.    The December 12, 2023 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there

18

be an "Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

88.     Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

89.     The December 12, 2023 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the December 12, 2023 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

90.     However, the December 12, 2023 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $10,763.89 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the December 12, 2023 Agreement expressly contemplated 18 payments in the amount of $10,763.89 per week, for a total of $193,750. The December 12, 2023 Agreement described the $10,763.89 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

91.     The December 12, 2023 Agreement also included a one-time "Underwriting Fee" of $6,250, which, upon information and belief, bore no relation to actual expenses incurred

by PMF's underwriters.  In actuality, the Underwriting Fee was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

92.    PEB was also required to pay PMF a "Financing Fee" of $1,750, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

93.    Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing was a fraction of the amounts charged.  Instead, these fees were merely additional disguised interest.

94.    Thus, in reality, the December 12, 2023 Agreement was a loan of $125,000 that required repayment of $193,750 in just 18 weeks and payable in fixed weekly installments.  This translated into an annual interest rate of approximately 158%.  Thus, on its face, the loan contained an interest rate approximately six (6) times greater than the 25% maximum per annum interest rate permitted under New York law.

95.    Upon information and belief, PMF's intent in executing the December 12, 2023 Agreement was to make a loan requiring repayment of a fixed installment that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment may be made.  Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timeline of payment by PEB's account debtors.

96.     PMF did not advance the entire Purchase Price in a lump sum.  Instead, PMF advanced the funds in several tranches, thereby increasing the effective interest rate.

97.     By revising the Specified Percentage of PEB's receivables to a fixed amount of $10,763.89 per week, the December 12, 2023 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the December 12, 2023 Agreement purported to give PEB the option to request a reconciliation to ensure the amounts remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

98.     The December 12, 2023 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

**6.     The December 18, 2023 Merchant Agreement**

99.     On December 18, 2023, PEB and PMF entered into a Merchant Agreement (the "December 18, 2023 Agreement").  Under the December 18, 2023 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $880,000, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

100.     The December 18, 2023 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there

be an "Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

101.    Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

102.    The December 18, 2023 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the December 18, 2023 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

103.    However, the December 18, 2023 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $56,833.33 per week, to be remitted in the form of weekly ACH withdrawals from PEB's operating account. Thus, the December 18, 2023 Agreement expressly contemplated 18 payments in the amount of $56,833.33 per week, for a total of $1,364,000. The December 18, 2023 Agreement described the $56,833.33 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

104.    The December 18, 2023 Agreement also included a one-time "Underwriting Fee" of $88,000, which, upon information and belief, bore no relation to actual expenses incurred

by PMF's underwriters. In actuality, the Underwriting Fee was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

105.    PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

106.    Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing was a fraction of the amounts charged. Instead, these fees were merely additional disguised interest.

107.    Thus, in reality, the December 18, 2023 Agreement was a loan of $880,000 that required repayment of $1,364,000 in just 24 weeks and payable in fixed weekly installments. This translated into an annual interest rate of approximately 118%. Thus, on its face, the loan contained an interest rate approximately five (5) times greater than the 25% maximum per annum interest rate permitted under New York law.

108.    Upon information and belief, PMF's intent in executing the December 18, 2023 Agreement was to make a loan requiring repayment of a fixed installment that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment may be made. Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timeline of payment by PEB's account debtors.

109.    PMF did not advance the entire Purchase Price in a lump sum.  Instead, PMF advanced the funds in several tranches, thereby increasing the effective interest rate.

110.    By revising the Specified Percentage of PEB's receivables to a fixed amount of $56,833.33 per week, the December 18, 2023 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the December 18, 2023 Agreement purported to give PEB the option to request a reconciliation to ensure the amounts remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

111.    The December 18, 2023 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

### 7.    The January 16, 2024 Merchant Agreement

112.    On January 16, 2024, PEB and PMF entered into a Merchant Agreement (the "January 16, 2024 Agreement").  Under the January 16, 2024 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $666,706, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

113.    The January 16, 2024 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there be an "Event

of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%." Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

114.    Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

115.    The January 16, 2024 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance." Under the January 16, 2024 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

116.    However, the January 16, 2024 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $43,058.09 per week, to be remitted in the form of weekly ACH withdrawals. Thus, the January 16, 2024 Agreement expressly contemplated 24 payments in the amount of $43,058.09 per week, for a total of $1,033,394.30. The January 16, 2024 Agreement described the $43,058.09 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

117.    The January 16, 2024 Agreement also included a one-time "underwriting fee" of $66,0670.60, which, upon information and belief, bore no relation to actual expenses

incurred by PMF's underwriters.  In actuality, the "Underwriting Fee" was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

118.    PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

119.    Although these fees purportedly were related to the costs of underwriting and financing, the actual cost of the underwriting and financing fees was a fraction of the amounts charged.  Instead, these fees were merely additional disguised interest.

120.    Thus, in reality, the January 16, 2024 Agreement was a loan of $666,706 that required repayment of $1,033,394.30 in just 24 weeks.  This translated into an annual interest rate of approximately 170%.  Thus, on its face, the loan contained an interest rate nearly seven (7) times greater than the 25% maximum per annum interest rate permitted under New York law.

121.    Upon information and belief, PMF's intent in executing the January 16, 2024 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment would be made.  Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timelines of payment by PEB's account debtors.

122.    PMF did not advance the entire Purchase Price.  Instead, PMF advanced less than the entire Purchase Price in several tranches, which increased the effective interest rate.

123.    By revising the Specified Percentage of PEB's receivables to a fixed amount of $43,058.09 per week, the January 16, 2024 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the January 16, 2024 Agreement purported to give PEB the option to request a reconciliation to ensure the amount remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

124.    The January 16, 2024 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

**8.    The January 22, 2024 Merchant Agreement**

125.    On January 22, 2024, PEB and PMF entered into a Merchant Agreement (the "January 22, 2024 Agreement," together with the October 17, 2023 Agreement, October 25, 2023 Agreement, November 6, 2023 Agreement, November 22, 2023 Agreement, December 12, 2023 Agreement, December 18, 2023 Agreement and January 16, 2024 Agreement, the "Agreements").

126.    Under the January 22, 2024 Agreement, PMF agreed to advance to PEB a stated "Purchase Price" of $2,684,478.27, in exchange for the purported purchase of a "Specified Percentage" of PEB's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and/or third-party payors," until "the 'Purchased Amount' is delivered by or on behalf of Merchant to PMF."

127.    The January 22, 2024 Agreement provided that the "Specified Percentage" initially was set at eighteen percent (18%) of PEB's future receipts, but should there be an "Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%."  Thus, upon a single failure of PEB to provide 24 hours' notice to PMF that PEB had insufficient funds to cover a withdrawal or other non-material violation of the Terms and Conditions, PMF purportedly would be entitled to PEB's entire revenue stream.

128.    Purportedly, the Purchase Price was based on the current fair market value of the Specified Percentage of PEB's future receivables, and, ostensibly, payments to PMF were to be conditioned upon PEB's sale of products and services and the payment therefor.

129.    The January 22, 2024 Agreement authorized PMF to make daily withdrawals from PEB's designated depository account, each such withdrawal being labeled a "Daily Remittance."  Under the January 22, 2024 Agreement, "[t]he Daily Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily revenues of Merchant during the previous calendar month divided by (c) the number of business days in the calendar month."

130.    However, the January 22, 2024 Agreement contained an Addendum, whereby the Specified Percentage of 18% was converted to a fixed sum in the amount of $113,574.08. per week, to be remitted in the form of weekly ACH withdrawals.  Thus, the January 22, 2024 Agreement expressly contemplated 39 payments in the amount of $113,574.08 per week, for a total of $4,429,389.15.  The January 22, 2024 Agreement described the $113,574.08 weekly withdrawal amount as a "good faith estimate" of the Specified Percentage, supposedly based on PEB's historical receipts from the preceding month.

131.    The January 22, 2024 Agreement also included a one-time "underwriting fee" of $268,447.83, which, upon information and belief, bore no relation to actual expenses incurred by PMF's underwriters.  In actuality, the "Underwriting Fee" was merely more usurious interest under the guise of an exorbitant fee untethered to any actual costs incurred by PMF.

132.    PEB was also required to pay PMF a "Financing Fee" of $2,995, which like the Underwriting Fee, bore no relation to actual expenses incurred by PMF and was merely additional usurious interest under the guise of a fee disconnected from any actual costs incurred by PMF.

133.    Although these fees purportedly were related to the costs of underwriting and financing, the actual costs of the underwriting and financing fees were a fraction of the amounts charged.  Instead, these fees were merely additional disguised interest.

134.    Thus, in reality, the January 22, 2024 Agreement was a loan of $2,684,478.27 that required repayment of $4,429,389.15 in just 39 weeks.  This translated into an annual interest rate of approximately 109%.  Thus, on its face, the loan contained an interest rate more than four (4) times greater than the 25% maximum per annum interest rate permitted under New York law.

135.    Upon information and belief, PMF's intent in executing the January 22, 2024 Agreement was to make a loan requiring repayment of a fixed amount that would guarantee a desired return within a specified period, rather than to purchase a percentage of PEB's receivables and bear the risk associated with PEB's collection of those receivables and the uncertain timeframe within which repayment would be made.  Further, upon information and belief, internal approval for this transaction was based on guaranteed payment within a projected time period, not a fixed percentage of PEB's receivables dependent on the timelines of payment by PEB's account debtors.

136.    PMF did not advance the entire Purchase Price.  Instead, PMF advanced less than the entire Purchase Price in several tranches, thereby increasing the effective interest rate.

137.    By revising the Specified Percentage of PEB's receivables to a fixed amount of $113,574.08 per week, the January 22, 2024 Agreement no longer was conditioned upon PEB's sale of products and services, but instead was a loan with guaranteed repayment to PMF, fixed weekly payments and a predetermined term.  Although the January 22, 2024 Agreement purported to give PEB the option to request a reconciliation to ensure the amount remitted equaled the Specified Percentage, the agreement stated that any potential reconciliation "may" be granted by PMF.  At all times, PMF exercised sole discretion over whether to grant a reconciliation request by PEB.  At no time was PMF under an obligation to grant a reconciliation request.

138.    The January 22, 2024 Agreement also required PEB to grant PMF a security interest in all assets owned or thereafter acquired, and required PEB owner Mr. Padilla to personally guarantee PEB's performance under the Agreement.

## B.    Defendants Falsely Represented that the Agreements Implicated Purchases of Future Receivables

139.    PMF shrouded its usurious loans in contracts purporting to provide for the purchase of future receivables.

140.    PMF disguised the high-interest loan agreements it relied upon to establish the usurious loans by deceptively titling each as a "Merchant Agreement" and characterizing the transactions as factoring, merchant cash advances or revenue financing.

141.    Each Agreement falsely represented that "Merchant is selling a portion of a future revenue stream to PMF at a discount, not borrowing money from PMF, therefore there is

no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by PMF."

142.    The Agreements purportedly required PEB to sell, assign and transfer to PMF a "Specified Percentage" of PMF's "future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers and other third party payors" arising from "Merchant's sale of goods and/or services (the "Transactions")."

143.    In an effort to obscure the Agreements' true economic nature and avoid state usury laws, Defendants included gratuitous provisions purporting to disclaim any collection of interest.

144.    The Agreements each provided that "Merchant is selling a portion of a future revenue stream to PMF at a discount, not borrowing money from PMF, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by PMF."

145.    The Agreements also stated: "Merchant and PMF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from PMF to Merchant. . . .  In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law."

146.    The Agreements further contained language purporting to bring the otherwise unlawful Agreements into compliance by reducing any judicially-determined interest rate to the maximum rate of interest permitted by applicable law, providing:

In the event that a court nonetheless determines that PMF has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and PMF shall promptly refund to Merchant any interest received by PMF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that PMF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law.

147.     The Agreements also contained unlawful and ineffective attempts to waive any defense of usury, providing: "As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding."

## C.     The Agreements Functioned as Usurious Loans With Fixed Terms

148.     The notion that Defendants were acquiring future receivables was deceptive, misleading and intended to obfuscate the true, usurious nature of the loans Defendants extended.  In reality, Defendants demanded payment of a precise "Purchased Amount," and guaranteed payment through their control over, and security interest in, all of PEB's future receivables, personal guarantees and authorization to execute and file confessions of judgment. Among the Agreements' false, deceptive and misleading terms were:

a.     Each Agreement specified a precise dollar figure that PEB must repay – the "Purchased Amount."

b.     Until that precise dollar amount was repaid, Defendants exercised dominion and control over all of PEB's receivables and other assets.

c.     To ensure repayment of the Purchase Price, the Agreements required PEB to grant a security interest in all of its assets, including all of its bank accounts and all accounts receivable, and required PEB owner Mr. Padilla to execute a personal guaranty of PEB's performance under the Agreements.

d.    Belying the notion that the transactions involved a purchase of receipts, the collection of which Defendants bore risk, the Agreements authorized PMF to execute a confession of judgment against PEB and Mr. Padilla for the full amount due upon default and for PEB to execute an assignment of rents, both instruments to be executed and filed without notice or demand to PEB.

149.    The notion that Defendants were acquiring only a "Specified Percentage" of PEB's future receipts also was illusory.

150.    Although each Agreement initially set the "Specified Percentage" of receipts at 18%, each Agreement provided that upon an Event of Default or breach of the Term and Conditions the Specified Percentage shall increase to 100% -- thereby entitling PMF to every dollar on deposit in the designated account irrespective of whether or not the amounts on deposit related to the "Specified Percentage."

151.    Further, the Agreements do not specify which receivables and/or which account debtor's payments had been purchased by PMF.  Instead, the Agreements vaguely assign a percentage of receivables arbitrarily set by PMF to justify its anticipated rate of return the duration of the transaction.

152.    PEB retained the obligation to collect revenues from its accounts and was permitted to possess and use those revenues so long as the Daily Remittance was paid.

153.    The Agreements substituted the "Specified Percentage" for a specific dollar amount that PMF would withdraw from PEB's account at any time.  Whether in the Agreement, an Appendix or Debit Authorization Form, in each instance PMF substituted the "Specified Percentage" of future receipts for a specific "Daily Remittance," "Weekly Remittance" or "Daily Agreed Remittance" that PMF would debit from PEB's account.

154.    Because the Agreements required payment of a specified "Purchased Amount" instead of actual receipts and extracted a specified daily or weekly withdrawal amount instead of a "Specified Percentage" of receivables, the Agreements compelled payment of a precise dollar amount over a fixed term.  That is, the Agreements functioned like loans.  Because the repayment term was so short and the repayment amount so high, the loans were usurious.

155.    Critically, because the Agreements required payment of a specified "Purchased Amount" instead of actual receipts and extracted a specified daily or weekly withdrawal amount instead of a "Specified Percentage" of receivables, PMF no longer bore the risk of PEB's collections, as a true purchaser of receivables would.  Rather, the Agreements granted PMF the right to seize the full daily or weekly withdrawal amount from PEB's account, irrespective of the actual rate and amount of PEB's collections, until the entire Purchased Amount was repaid.

**D.    The Agreements Contained Sham and Illusory Reconciliation Provisions**

156.    Defendants included in the Agreements sham and illusory reconciliation provisions.  They did so in an attempt to provide a veneer of legitimacy to the transactions while ensuring they collected the Purchased Amount in a fixed amount and finite term.

157.    Each of the Agreements contained a reconciliation provision (Section 1.4), but on terms designed to ensure PEB would be unable to take advantage of it.

158.    First, PMF required PEB to represent that the daily withdrawal amount set forth in the Agreement was a "good faith estimate" of the Specified Percentage of future receivables.  That way, if PEB complained the payment amount was too high, and that actual receipts were lower, doing so would constitute a breach of a representation and warranty, trigger

PMF's right to accelerate the debt, transform the "Specified Percentage" into 100% of PEB's receivables, and authorize PMF to exercise all remedies upon default.

159.    Second, and perhaps most critically, reconciliation remained entirely at PMF's sole discretion.  The reconciliation provision states that PMF "may" grant a reconciliation request.  Under no circumstance was PMF under an obligation to modify the Daily Remittance to reflect the true pace and amount of PEB's collections.  Each Agreement is devoid of any standards or criteria establishing the circumstances under which PMF may grant a merchant's request for reconciliation.

160.    Third, PEB's ability to even request reconciliation was substantially curtailed.  The Agreements permitted PEB to make a reconciliation request "every two (2) calendar weeks after the funding of the Purchase Price to Merchant."  Thus, even while PMF made daily or weekly withdrawals from PEB's account, PEB could only seek reconciliation during a limited window, which substantially eroded the benefit of a purported right to reconciliation.  Conveniently, the window for reconciliation would close the further away from the funding date, effectively making reconciliation unlikely when it would be most helpful to avoid a default.

161.    If PEB had sufficient revenue to pay the Daily Remittance, reconciliation would be unnecessary.  Whereas, if PEB sustained a sudden decrease in revenue requiring reconciliation, it would be in default of the Agreement before it would even have a chance to request reconciliation.  These functional realities made the right to reconciliation virtually meaningless.

162.    Fourth, the Agreements do not contain any consequences to PMF if it refuses to grant a *bona fide* reconciliation request submitted by PEB.

163.    Fifth, PEB was not permitted to request reconciliation if it was in default. Because the Agreements were structured in a way to make default ultimately inescapable, it was a near-certainty that the merchant would already be in default before it even had reason to know that it needed to request reconciliation to avoid default.

164.    In practice, as PEB's financial condition deteriorated, it was never able to exercise the reconciliation provision.  Instead, when the pace and amount of PMF's withdrawals became excessively burdensome, Defendants instead convinced PEB to enter into yet another Agreement, each one having onerous and demanding repayment terms and conditions, descending PEB into a spiral of increasing and unsustainable payments to PMF.

165.    Upon information and belief, PMF does not grant reconciliation requests. Instead, when a merchant falls behind on payments, PMF either declares an Event of Default, entitling it to accelerate the entire Purchased Amount, or convinces the merchant, on the brink of financial collapse, to enter into yet another Merchant Agreement.

166.    Working together, the Agreements' mechanisms that (i) replaced the purchase of receivables with a specific "Purchased Amount," (ii) replaced the "Specified Percentage" of receipts with a specific daily or weekly remittance amount, and (iii) made the right to reconciliation entirely discretionary and illusory served Defendants' ultimate goal and intent of requiring repayment of a specific amount on a specific timeline generating a specific (usurious) rate of return.

### E.    PMF Retained Recourse if PEB filed for bankruptcy

167.    Another hallmark of a loan is the lender's right to repayment if the debtor files for bankruptcy.  Here, the transactions were structured in such a way to ensure repayment under all circumstances.

168.    Although the Agreements gratuitously provided that "Merchant going bankrupt or going out of business, or experiencing a slowdown, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement," PMF included other provisions in the Agreement to ensure the debt would be repayable under all circumstances, even if PEB filed for bankruptcy.

169.    First, each Agreement required PEB to represent and warrant that it "does not contemplate filing for bankruptcy in the next six months" and that it "does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it."

170.    Because the Agreements generally had short-duration, fixed terms, the representations and warranties provided by the merchant protected PMF against a bankruptcy filing by all but assuring that a bankruptcy filing during the first six months of the repayment term would result in a breach of PEB's representations and warranties.

171.    Second, the Security Agreement and Guarantee provides that "PMF is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets" and, notwithstanding this right, "Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by PMF."  Therefore, while the mere filing of bankruptcy is not "in and of itself" a breach of the Agreements, PMF was empowered to ignore a merchant's bankruptcy filing and proceed to recover outstanding amounts directly from the merchant's pledged security, which upon an event of default constitutes virtually every asset of the merchant.

172.    Third, if PEB filed for bankruptcy, PMF, as a secured creditor, would still be entitled to pursue recovery of the debt through its broadly defined security interest.  Under the

Security Agreement, there are virtually no assets of PEB that would not be sucked into PMF's broad security interest, which include: equipment, general intangibles, instruments, inventory, proceeds therefrom, all funds in the merchant's bank account, present and future electronic check collection and any amount due to PMF under the Agreement.

173.    Fourth, if PEB filed for bankruptcy, PMF still had the right to recover the debt through enforcement of the personal guaranty by PEB's owner, Mr. Padilla.  Relatedly, Mr. Padilla, as the purported guarantor, is not only obligated to indemnify PMF for any and all losses associated with the debt, he also is required to indemnify PMF for any amounts that it may be required to return to PMF as a result of a bankruptcy filing.

174.    Fifth, while the filing for bankruptcy is not "in and of itself" a breach of the Agreements, a merchant who files for bankruptcy is almost certain to have triggered a default by: (i) transferring or selling all or substantially all of its assets; (ii) using multiple depository accounts without PMF's written consent; (iii) changing its depositing account without PMF's consent; or (iv) defaulting under any other agreement with PMF.

175.    Therefore, while a bankruptcy is not "in and of itself" a breach of the Agreements, there are virtually no circumstances where the merchant would not default and breach the Agreements in the run up to bankruptcy.

## F.    Defendants Deliberately Camouflaged the True Nature of the Transactions

176.    Despite their documented form and gratuitous disclaimers, the transactions that PMF entered into with PEB are, in economic reality, loans that are absolutely repayable under all circumstances.  The Agreements' indicia of a loan include:

a.      The Daily Remittance was fixed and the so-called reconciliation provision was illusory to avoid state usury laws.  Rather, just like a typical loan, the Purchased Amount was required to be paid within a specific time and in equal installments.

b.      The default and remedy provisions purported to hold PEB absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate PEB to ensure sufficient funds were maintained in the designated account to make the daily or weekly payments and, after a single failure by PEB to provide PMF with 24 hours' notice that the designated account will have insufficient funds to cover the Daily Remittance, PMF was authorized to declare an Event of Default, accelerate the entire debt and demand that PEB immediately pay the outstanding balance plus fees.

c.      The Agreements do not identify specific receivables being purchased or the account debtors whose payments have been purchased by PMF.

d.      The transactions were underwritten based on PEB's credit, not the credit of the account debtors whose receivables were purportedly being purchased by PMF.

e.      The Purchased Amount was not calculated based upon the fair market value of future receivables, but rather was unilaterally dictated by Defendants, based upon the interest rate they wanted to be paid and the duration until payment in full.

f.      The amount of the Daily or Weekly Remittance was determined based upon when and how much Defendants wanted to be paid, and not based upon any good faith estimate of PEB's future account receivables.

g.      Defendants required PEB to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company

would continue to operate and generate receivables and that a breach of such obligations, representations and warranties constituted a default, which fully protected Defendants from any risk of loss resulting from the PEB's failure to collect receivables.

177.    Usurious intent can also be discerned from Defendants' practices. Defendants determined the repayment schedule based on the number of days in which they wanted to be repaid. The number of days for repayment had no relation to the timing of the percentage of PEB's receivables that Defendants were purporting to purchase.

178.    Upon information and belief, Defendants never granted a reconciliation request made by PEB and, instead, convinced PEB's representative(s) to enter into additional transactions to extract more usurious interest and unconscionable fees from PEB. Defendants' scheme was successful. PEB was required to enter into at least eight (8) Agreements to remain solvent and avoid collapse under the weight of the usurious interest being charged by PMF.

179.    Defendants deliberately avoided reconciling PEB's Daily Remittance. Instead, PMF preferred to keep PEB trapped in a continual state of entering into a new transaction in order to honor the onerous demands of the previous transaction. All along, it was Defendants' goal to keep PEB locked into a cycle of short-term, high-interest loans, which is exactly what Defendants did, making PEB dependent on PMF's unlawful scheme to continue operations.

180.    Under the Agreements, PEB authorized PMF to prepare, execute and file with the court a confession of judgment without notice or demand of any kind.

181.    Additionally, PEB was required to pledge additional collateral, in amounts disproportionate to the extent of collateral necessary to secure repayment. Under the Agreements, PEB granted to PMF all rights, title and interest in and to any and all equipment, receivables or

other chattels comprising PMF's broad security interest. That is, PMF claimed priority status as a secured creditor under Article 9 of the Uniform Commercial Code, enabling Defendants to ensure full repayment in the event of PEB's default.

### G.    Defendants' Conduct Demonstrates that the Transactions Were Usurious loans

182.    Defendants understood and intended the true, usurious nature of the loans they extended, as evidenced by their execution of Agreements in short succession, on irreconcilable terms and before the completion of the previous transaction.

183.    Defendants purported to engage in extensive underwriting and due diligence concerning PEB's business, accounts, and receivables (charging as much as $268,447 in a single transaction for such "underwriting").

184.    Over the span of only three (3) months, PMF assessed total Underwriting Fees of $604,506 and Financing Fees of $22,715.

185.    Additionally, the "Specified Percentage" contained in the Agreements was not a "good faith estimate" of PEB's future receivables.

186.    Under each Agreement, PMF purportedly purchased 18% of PEB's future receivables. In reality the Specified Percentage was not proportional to PEB's actual receivables. Rather, the Specified Percentage was unilaterally selected by PMF based on its desired rate of return and duration of the loan. For example, while the January 16, 2024 Agreement estimated the Weekly Remittance to be $27,779, the January 22, 2024 Agreement -- executed only six days after the January 16, 2024 Agreement -- estimated the Weekly Remittance to be $113,574 – a nearly 500% increase in revenue in only six days.

187.    Similarly, the December 12, 2023 Agreement calculated PEB's Weekly Remittance to be $10,763, while the December 18, 2023 Agreement calculated PEB's Weekly Remittance to be $56,833 – another nearly 500% increase in revenue in only six days.

188.    Defendants were aware that PEB's future receivables were not expected to increase five-fold between December 12, 2023 to December 18, 2023 or from January 16, 2024 to January 22, 2024.

189.    The five-fold disparity between the Daily Remittance in the last two Agreements belies any claim by PMF that the Daily Remittance constitutes a "good faith estimate" of the "Specified Percentage" of PEB's future receivables.  Indeed, this fact establishes that Defendants manipulated the Daily Remittance amount to achieve their desired rate of return, the time period within which they desired repayment, and the maximum payments Defendants believed PEB might be able to sustain long enough for Defendants to unlawfully extract as much usurious interest as they could before PEB collapsed under the crushing burden of PMF's demands, triggering an Event of Default permitting PMF to accelerate the debt and enforce its draconian rights under the Agreements.

190.    Indeed, after the weight of the Weekly Remittance payments grew increasingly unsustainable, and with PEB nearing financial collapse, Defendants seized the opportunity to take further advantage of Mr. Padilla by offering to purchase PEB out from under Mr. Padilla for a fraction of its actual value.  Thankfully, Mr. Padilla had the wherewithal and determination to refuse Defendants' attempt to rob him of his life's work.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962(c))

191.    PEB repeats and realleges the allegations contained in each of the preceding paragraphs as if set forth at length herein.

### A.    Culpable Persons

192.    Defendants were engaged in a common enterprise with a shared goal of soliciting, funding, servicing, and collecting on the usurious loans extended to PEB (the "Enterprise").  The Enterprise solicited, funded, serviced and collected on usurious loans as a regular part of its business.

193.    PMF and the Individual Defendants are all RICO "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal or beneficial interest in property.

194.    At all relevant times, PMF and/or the Individual Defendants are persons that exist separate and distinct from the PMF Enterprise.

195.    Through their operation of PMF, the Individual Defendants knowingly and intentionally solicited, underwrote, funded, serviced and collected unlawful debt.

196.    Upon information and belief, the Individual Defendants held a legal and/or beneficial interest in PMF and benefited from the criminal conduct alleged herein.

### B.    The Enterprise

197.    PMF and the Individual Defendants constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

198.    PMF and the Individual Defendants are associated in fact for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York, California and other states.

199.    The Enterprise issued usurious loans under the guise of Merchant Agreements to borrowers such as PEB, facing financial distress and who lack sophistication of experienced borrowers.

200.    Since at least May 2023 and continuing to present, the Enterprise members have had ongoing relations with each other through common control/ownership, employment, shared personnel, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and collecting upon unlawful debt issued to small businesses throughout the United States.

201.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) and 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the interest rates are more than twice the legal rate permitted under New York Penal Law §190.40 and the laws of other states.

C.    Defendants' Roles in Operating the Enterprise

202.    At all relevant times, the Individual Defendants organized themselves and the Enterprise into a structured, hierarchical group with positions, titles and a reporting structure to provide the veneer of a lawful enterprise and operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

1.    Kashat

203.    At all relevant times, Kashat was a Managing Director at PMF and a supervisor and point person of the Enterprise.  At times, Kashat communicated directly with representatives of PEB.

204.    Kashat had supervisory authority and oversaw the day-to-day operations of the Enterprise and had decision-making authority on all financial decisions, including, without

limitation, which usurious loans the Enterprise would extend, how such loans would be funded and the ultimate repayment terms, including the amount to lend, the rate of return and the term of the loan.

205.    In his capacity as a manager and supervisor of the Enterprise, Kashat, together with Gieselmann, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including (i) the form of Merchant Agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF under the merchant agreements to deny merchants of the benefit of certain contractual provisions; (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations; and (v) engaging in high-pressure sales tactics and/or threats of financial ruin designed to further the Enterprise's unlawful scheme and generate more revenue by charging usurious interest.

206.    Kashat has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including its affairs, funding the Enterprise, directing its members to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

207.    Kashat has operated PMF as part of an unlawful enterprise to collect upon unlawful debt.  As a member of the Enterprise, Kashat has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham merchant agreements on behalf of the Enterprise; (iii) serviced the usurious loans; and

(iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) charged usurious interest disguised as legitimate fees.

208.    Kashat has ultimately benefited from the Enterprise's unlawful activity by receiving a portion of the usurious loan proceeds through PMF under the guise of commissions and other compensation disguised as legitimate and lawful income from employment.

### 2.    Gieselmann

209.    At all relevant times, Gieselman was a Director at PMF and reported to, and was supervised by, Kashat.  Gieselmann was responsible for the day-to-day operations of the Enterprise and routinely had direct communications with representatives of PEB.

210.    Together with Kashat, Gieselmann was responsible for the day-to-day operations of the Enterprise and had day-to-day decision-making authority on all financial decisions, including, without limitation, which usurious loans the Enterprise would extend, how such loans would be funded and the ultimate repayment terms, including the amount to lend, the rate of return and the term of the loan.

211.    In his capacity as a Director within the Enterprise and in charge of day-to-day operations of the Enterprise, Gieselmann, together with Kashat, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including (i) the form of Merchant Agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF under the Merchant Agreements to deny merchants of the benefit of certain contractual provisions; (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect

upon the unlawful debt if the merchant defaulted upon its obligations; and (v) engaging in high-pressure sales tactics and/or threats of financial ruin designed to further the Enterprise's unlawful scheme and generate more revenue by charging usurious interest.

212.    Gieselmann has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including its affairs, funding the Enterprise, directing its members to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

213.    Gieselmann, together with Kashat, has operated PMF as part of an unlawful enterprise to collect upon unlawful debt.  As a member of the Enterprise, Gieselmann has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham merchant agreements on behalf of the Enterprise; (iii) serviced the usurious loans; (iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) charged usurious interest disguised as legitimate fees.

214.    Gieselmann has ultimately benefited from the Enterprise's unlawful activity by receiving a portion of the usurious loan proceeds through PMF under the guise of commissions and other compensation disguised as legitimate and lawful income from employment.

### 3.    Bejko

215.    At all relevant times, Bejko was a Senior Credit Analyst at PMF and took orders and direction from Gieselmann and/or Kashat.

216.    In her capacity as a Senior Credit Analyst, Bejko was responsible for the funding operations of the Enterprise and contributed to funding decisions of the Enterprise including, without limitation, which usurious loans would be funded, how such loans were to be

funded, the source of funding and the ultimate payment terms, amount and the term of each usurious loan.

217.    As a Senior Credit Analyst, Bejko, together with Kashat and Gieselmann, was responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including (i) the form of merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF under the Merchant Agreements to deny merchants of the benefit of certain contractual provisions; (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations; and (v) engaging in high-pressure sales tactics and/or threats of financial ruin designed to further the Enterprise's unlawful scheme and generate more revenue by charging usurious interest.

218.    Bejko has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including its affairs, funding the Enterprise, directing its members to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

219.    Bejko has operated PMF as part of an unlawful enterprise to collect upon unlawful debt.  As a member of the Enterprise, Bejko has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham merchant agreements on behalf of the PMF Enterprise; (iii) serviced the usurious loans; (iv)

set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) charged usurious interest disguised as legitimate fees.

220.    Bejko has ultimately benefited from the Enterprise's unlawful activity by receiving a portion of the usurious loan proceeds through PMF under the guise of commissions and other compensation disguised as legitimate and lawful income from employment.

**D.    PMF**

221.    Upon information and belief, PMF has legitimate and lawful operations and engages in the lawful sale and service of lines of credit, equipment financing, mortgage financing, term loans, factoring and merchant cash advances.

222.    The Individual Defendants have operated PMF as part of an unlawful enterprise to collect on unlawful debt.

223.    PMF, acting through the Individual Defendants, has knowingly and intentionally participated in unlawful and criminal conduct in furtherance of the Enterprise, including but not limited to: (i) selecting and using the form of merchant agreements used to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; (iii) exercising discretion granted to PMF under the merchant agreements to deny merchants of the benefit of certain contractual provisions; and (iv) obtaining authorizations to file confessions of judgment without demand or notice to collect upon the unlawful debt if the merchant defaulted upon its obligations.

224.    Through the actions of the Individual Defendants, PMF has: (i) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (ii) entered into sham Merchant Agreements on behalf of the Enterprise; (iii) serviced the

usurious loans; (iv) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) charged usurious interest disguised as legitimate fees.

225.    PMF has ultimately benefited from the Enterprise's unlawful activity by receiving usurious interest proceeds through PMF under the guise of loan and financing income, usurious interest disguised as fees and other revenue disguised as legitimate and lawful income.

### E.    Interstate Commerce

226.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

227.    The members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in California, including PEB, and throughout the United States, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

228.    In the present case, all communications between the members of the Enterprise were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails and wires to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and to collect the daily or weekly withdrawals and charge fees via interstate electronic ACH debits.

229.    In addition, at the direction of PMF, each of the Agreements was executed in California, and executed copies of the Agreements were sent from California to personnel associated with the Enterprise located in New York and New Jersey.

### F.    Injury and Causation

230.    PEB has been injured in its business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c) in an amount to be determined at trial.

231.    The injuries to PEB directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected criminally usurious loan payments.

232.    PEB has incurred attorneys' fees and costs associated with exposing and prosecuting the Enterprise's criminal activity.

233.    Pursuant to 18 U.S.C. § 1964(c), PEB is entitled to treble damages, plus costs and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Conspiracy Under 18 U.S.C. § 1962(d))

234.    PEB repeats and realleges the allegations contained in each of the preceding paragraphs as if set forth at length herein.

235.    PMF and the Individual Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

236.    By and through each of their business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and their frequent email communications concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, the members of the Enterprise knew its nature, and each individual member knew that the Enterprise extended beyond his/her/its individual role. Moreover, through the same connections and coordination, each individual member knew that the other members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

237.    Each individual member agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each individual member was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the members shared a common purpose, namely the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debt, including the Agreements.

238.    PEB has been injured in its business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

239.    The injuries to PEB directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected usurious loan payments.

240.    PEB has also incurred attorneys' fees and costs associated with exposing and prosecuting Defendants' unlawful activities.

241.    Pursuant to 18 U.S.C. § 1964(c) and (d), PEB is entitled to treble damages, plus costs and attorneys' fees from Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in its favor against Defendants, jointly and severally, and seeks a judgment:

a.  Declaring each of PEB's agreements with Defendants to be a usurious loan in violation of New York Penal Law § 190.40;

b.  Declaring that Defendants have charged and received interest under the

Agreements in excess of the highest rate allowable by law and that Defendants must refund to PEB any and all interest payments received in connection with the usurious loans;

c.   Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined by at trial;

d.   Awarding treble damages;

e.   Requiring Defendants to pay Plaintiff's attorneys' fees and costs; and

f.   Any further relief deemed appropriate by the Court.

Dated: November 19, 2024
       Basking Ridge, NJ

REYNOLDS LAW GROUP LLC


By: /s/ Scott E. Reynolds, Esq.
    SCOTT E. REYNOLDS, ESQ.

*Attorneys for Plaintiff,*
*PEB, Inc.*

21 Rock Ridge Drive, Suite A
Rye Brook, NY 10573
(908) 367-9060
sreynolds@reynolds-lawgroup.com

*and*

233 Mt. Airy Road, Suite 100
PMB 8491
Basking Ridge, NJ 07920
(908) 367-9060
sreynolds@reynolds-lawgroup.com