UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/1/2025___
```

------------------------------------------------------------------X
:
PEB, INC., :
:
Plaintiff, :
:
-v- :          24-cv-08791 (LJL)
:
PREMIUM MERCHANT FUNDING 26, LLC, et al., :          OPINION AND ORDER
:
Defendants. :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

On November 19, 2024, Plaintiff PEB, Inc. ("PEB" or "Plaintiff"), commenced this action under the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, seeking treble damages against Defendants with respect to a series of at least eight merchant cash advance ("MCA") agreements that Plaintiff contends were disguised usurious loans. Dkt. No. 1 ("Compl.").

Defendants Mason G. Kashat ("Kashat"), James P. Gieselmann Jr. ("Gieselmann"), Adela Bejko ("Beijko" and, with Kashat and Gieselmann, "Individual Defendants"), and Premium Merchant Funding 26, LLC ("PMF" and, with Individual Defendants, "Defendants"), move, pursuant to 9 U.S.C. § 4, for an order compelling arbitration and staying this action pending arbitration. Dkt. No. 26. For the reasons that follow, the motion is granted.

## BACKGROUND

### I. The Allegations of the Complaint

The Court takes the allegations of the complaint as true for purposes of this motion.

PEB is a corporation organized and existing under the law of the State of California with its principal place of business in California. Compl. ¶ 1. It is a specialty contractor of industrial power plants in California. *Id.* ¶ 18. Its owner is Harley Padilla. *Id.* ¶ 20.

PMF is a Delaware corporation with its principal place of business in New York. *Id.* ¶ 2. It is engaged in the sale of financial products and services, including lines of credit, equipment financing, mortgage financing, term loans, factoring, and merchant cash advances. *Id.* ¶ 24. Kashat was a Managing Director at PMF. *Id.* ¶ 203. Gieselmann was a Director at PMF and reported to and was supervised by Kashat. *Id.* ¶ 209. Bejko was a Senior Credit Analyst at PMF and took orders and direction from Gieselmann and Kashat. *Id.* ¶ 215.

Like many businesses, PEB sustained a slowdown in its business operations as a result of the COVID-19 pandemic. *Id.* ¶ 19. By 2023, PEB's business had materially slowed. *Id.* ¶ 20. In order to retain employees and avoid mass layoffs, PEB looked for short-term financing as a bridge to make it through what would ultimately be the waning days of the pandemic. *Id.* ¶¶ 20–21. PMF offered what was represented to be a solution.

PMF representatives contacted PEB in or around May 2023. *Id.* ¶ 22. Between October 17, 2023, and January 22, 2024, PMF advanced approximately $2.4 million to PEB. *Id.* ¶ 33.

PMF's advances to PEB were made pursuant to eight MCA agreements. The MCA agreements are dated October 17, 2023, October 25, 2023, November 6, 2023, November 22, 2023, December 12, 2023, December 18, 2023, January 16, 2024, and January 22, 2024. Dkt. Nos. 28-3, 28-4, 28-5, 28-6, 28-7, 28-8, 28-9, 28-10. The MCA agreements took a similar form to one another. PMF characterized the transactions as factoring, merchant cash advances, or revenue financing. *Id.* ¶ 140. Each agreement represented that PEB, as the "Merchant," was "selling a portion of a future revenue stream to PMF at a discount, not borrowing money from

PMF." *Id.* ¶ 141, 144.  However, Plaintiff alleges that each of the MCA agreements was a disguised loan.  *Id.* ¶¶ 42, 55, 68, 81, 94, 107, 120, 134.  Under the MCA agreements, "PMF no longer bore the risk of PEB's collections, as a true purchaser of receivables would."  *Id.* ¶ 155. "Rather, the Agreements granted PMF the right to seize the full daily or weekly withdrawal amount from PEB's account irrespective of the actual rate and amount of PEB's collections, until the entire Purchased Amount was repaid."  *Id.* ¶ 155.  Although the MCA agreements contained a reconciliation provision, "reconciliation remained entirely at PMF's sole discretion," *id.* ¶ 159, and because of its timing provisions, "if PEB sustained a sudden decrease in revenue requiring reconciliation, it would be in default of the Agreement before it would even have a chance to request reciliation," *id.* ¶ 161.

The MCA agreements were signed by Padilla as owner of PEB.  *See, e.g.*, Dkt. No. 28-4 at 16.  In addition, Padilla signed a Guaranty in connection with the MCA agreements.  *Id.* at 15.

Between October 17, 2023, and January 22, 2024, PEB paid approximately $3 million in interest on advances of approximately $2.4 million.  Compl. ¶ 33.

PEB asserts that while the MCA agreements in form may have provided for the purchase by PMF of PEB's receivables, they were in substance high-interest, short-term loans.  *Id.* ¶¶ 27, 30, 139.  PEB claims that the effective rate of interest for each of the MCA agreements was usurious under New York law.  *Id.* ¶¶ 42, 55, 68, 81, 94, 107, 120, 134.  Plaintiff alleges that PMF and the Individual Defendants constituted a RICO enterprise with the common goals of soliciting, funding, servicing, and collecting upon usurious loans under the guise of MCA agreements.  *Id.* ¶¶ 197–198.

## II.    The Arbitration Provisions

Each of the MCA agreements has an identical arbitration provision, set forth under the heading "Arbitration and Dispute Resolution."  The provisions state:

5.1 <u>Agreement to Arbitrate All Disputes</u>. 'PMF' and Merchant agree that any Dispute shall be resolved by final and binding arbitration. The term "Dispute" is defined in the broadest possible manner and includes any and all claims or controversies arising out of or in any way related to this Agreement, Security Agreement and/or guaranty (collectively 'Agreement') or the relationship between PMF and Merchant, whether arising from or relating to the Agreement itself, or arising from alleged extra-contractual facts prior to, during, or subsequent to the Agreement, and whether those claims [sic] grounded in contract, tort, or other theory of law or equity. Dispute also includes any and all claims or controversies concerning the scope, validity, and enforceability of this Arbitration and Dispute Resolution provision. The Parties agree to arbitrate all threshold questions of arbitrability, including but not limited to whether this Arbitration and Dispute Resolution provision is enforceable. The phrase 'Arbitration and Dispute Resolution provision' shall refer to the entire Section 5.

5.2 <u>Governing Law</u>. This Arbitration and Dispute Resolution provision shall be governed by the Federal Arbitration Act, 9 U.S.C SECTION 1-16 ('FAA'). In the event a final, binding, and non-appealable judgment finds that the FAA does not apply, this Arbitration and Dispute Resolution provision shall be governed by the arbitration law of the State of New York. All Disputes other than Disputes over this Arbitration and Dispute Resolution shall be governed by the substantive law of the State of New York, regardless of the rules of conflict of laws and regardless of the legal theory which such matter is asserted.

…

5.7 <u>Who May Enforce this Arbitration Provision</u>. For purposes of this Arbitration and Dispute Resolution provision, 'Merchant' refers to Merchant and Merchant's heirs, successors, assigns, personal representatives, guardians, and/or bankruptcy trustees. For purposes of this Arbitration and Dispute Resolution provision, 'Merchant' also refers to Guarantor and Guarantor's heirs, successors, assigns, personal representatives, guardians, and/or bankruptcy trustees. For purposes of this Arbitration and Dispute Resolution provision, 'PMF' also refers to PMF and PMF's employees, agents, directors, officers, shareholders, governors, managers, members, parent companies, subsidiaries, affiliated entities, attorneys, predecessors, successors, assigns, heirs, and successors. PMF does not consent, and nothing in this Arbitration and Dispute Resolution provision shall be deemed a consent by PMF, to arbitrate any dispute with any person or entity other than Merchant, as defined herein.

Dkt. No. 28-4 §§ 5.1, 5.2, 5.7.[1]

---

[1] Because the arbitration provisions of each of the MCA agreements are identical, *see* Dkt. Nos. 28-3 § 5, 28-4 § 5, 28-5 § 5, 28-6 § 5, 28-7 § 5, 28-8 § 5, 28-9 § 5, 28-10 § 5, the Court hereafter refers to the October 25, 2023 MCA agreement, Dkt. No. 28-4, as the illustrative example.

Under the "Choice of Arbitrator / Rules of Arbitration" subsection, the Merchant has the right, regardless of who first demanded arbitration, to select either the American Arbitration Association or JAMS to administer the arbitration. *Id.* § 5.5. Regardless of who first demands arbitration, PMF is required to advance Merchant's portion of the arbitration expenses at the Merchant's request. *Id.* § 5.6.

Section 5.8 of the MCA agreements provides in pertinent part:

> **Survival and Severability of Arbitration and Dispute Resolution.** . . . The decision of any Party not to demand compliance with any portion of this Arbitration and Dispute Resolution provision shall not waive the Party's right to demand compliance with any other portion of this Arbitration and Dispute Resolution provision.

*Id.* § 5.8.

Section 5.12 of the MCA agreements provides:

> **Arbitration Carve-Out/Permitted Court Action.** Notwithstanding the arbitration obligations set forth in this Arbitration and Dispute Resolution provision, the Parties shall be permitted to seek and obtain monetary relief, in aggregate, up to an amount equal to the Purchase Amount plus an additional 40% thereof, by filing and maintaining and [sic] individual (i.e. bilateral; not class, joined, or consolidated) court action concerning a Dispute in a state or federal court located in the State and City of New York ("Permitted Court Action"). Merchant and Guarantor consent to the jurisdiction of those particular courts, and expressly waives any objection based on forum non conveniens, and agrees that such courts shall be the exclusive forum for any Permitted Court Action concerning any Dispute, notwithstanding that other courts may have jurisdiction over the parties and the subject matter.

*Id.* § 5.11.

Finally, Section 5.14 of the MCA agreements provides:

> **Interpreting this Arbitration Provision.** The purpose of this Arbitration and Dispute Resolution provision is to give binding effect to the Parties' intent to resolve all Disputes through binding bilateral arbitration except to the extent of a Permitted Court Action. Any ambiguities in this Arbitration and Dispute Resolution provision should be construed in favor of effectuating this intent. Similarly, the terms "and," or "or," and "and/or" should be construed conjunctively or disjunctively or both conjunctively and disjunctively, as appropriate, in order to effectuate this intent.

*Id.* § 5.14.

Outside of the "Arbitration and Dispute Resolution" provision, the MCA agreements also contain non-waiver provisions. Section 4.4 of the MCA agreements provides:

> **Waiver Remedies.** No failure on the part of PMF to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

*Id.* § 4.4.

## III.    The State Court Action

On August 26, 2024, PMF filed an action in New York State Supreme Court, Monroe County against PEB and Padilla (the "State Court Action"). Dkt. No. 30-1. The State Court Action is based on the January 16, 2024 and January 22, 2024 MCA agreements and the guaranties signed by Padilla in connection with those agreements. *Id.* PMF alleges that PEB and Padilla initially met their obligations under the agreements but that on or about May 14, 2024, they breached those agreements by blocking and depriving PMF of the weekly ACH withdrawals it was entitled to under the agreements. *Id.* ¶ 10. PMF alleges claims for breach of contract and breach of the guaranty. *Id.* ¶¶ 15–24. It seeks a judgment in the amount of $2,869,147.40, representing the balance due on the agreements including a default fee of $10,000, plus interest, costs, and disbursements. *Id.* ¶¶ 10–11, 14.

PEB and Padilla filed a Verified Answer and Affirmative Defenses on November 18, 2024. Dkt. No. 30-2. On December 12, 2024, PEB served its First Request for Production of Documents and its First Set of Interrogatories on PMF. Dkt. Nos. 30-3, 30-4.

PMF filed a Request for Judicial Intervention on January 3, 2025, requesting a preliminary conference. Dkt. No. 30-5. On January 10, 2025, the matter was assigned to the

Honorable Elena F. Cariola, J.S.C..  Dkt. No. 30-6.  Justice Cariola scheduled a preliminary

conference for February 12, 2025.  Dkt. No. 30-6.

The parties appeared for a preliminary conference before Justice Cariola on February 11,

2025.  Dkt. No. 30 ¶ 11.  Justice Cariola informed counsel that the court had transferred the

action to the Commercial Part due to the amount in controversy being in excess of $1 million and

that the Honorable Daniel J. Doyle, J.S.C., would be assigned to the case.  Dkt. No. 30 ¶ 11.

On March 17, 2025, PMF filed a motion for summary judgment in the State Court Action

pursuant to N.Y. C.P.L.R. 3212.  Dkt. No. 30 ¶ 12; Dkt. No. 30-8.  PMF also filed a statement of

material undisputed facts.  Dkt. No. 30-9.  PEB's deadline to submit an opposition to the motion

is April 28, 2025.  Dkt. No. 30 ¶ 15.  On April 8, 2025, PMF served a Notice to Admit on the

PEB parties.  Dkt. No. 30 ¶ 17; Dkt. No. 30-12.

## PROCEDURAL HISTORY

Plaintiff filed its complaint in this action on November 19, 2024.  *See* Compl.  The

complaint contains two causes of action: a violation of RICO, 18 U.S.C. § 1962(c), and

conspiracy to violate RICO, 18 U.S.C. § 1962(d).  Plaintiff alleges that PMF and the Individual

Defendants are RICO persons, that they together constitute a RICO enterprise, and that each of

PMF and the Individual Defendants participated in the affairs of the enterprise by collecting

upon unlawful and usurious loans.

Defendants appeared on December 31, 2024.  Dkt. Nos. 18–19.

On March 19, 2025, Defendants filed this motion to compel arbitration along with a

memorandum of law in support of the motion and the declaration of counsel.  Dkt. Nos. 26–28.

On April 16, 2026, Plaintiff filed a memorandum of law in opposition to the motion.  Dkt.

No. 29.  Plaintiff also filed the declarations of Scott E. Reynolds, Harley Padilla, and Jacqueline

Benyamini.  Dkt. Nos. 30–31.  On April 30, 2025, Defendants filed a reply memorandum of law in further support of the motion.  Dkt. Nos. 33–34.

## DISCUSSION

### I.    General Standards

The Federal Arbitration Act (the "FAA") "compels judicial enforcement of . . . written arbitration agreements."  *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001).  Under the FAA, a "written provision in any . . . contract . . . evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "Section 2 embodies [a] national policy favoring arbitration."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) ("Congress enacted the FAA to replace judicial indisposition to arbitration.").

Arbitration agreements stand "on equal footing with other contracts," so courts must "enforce them according to their terms."  *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *see also Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008) ("[T]he purpose of Congress in enacting the FAA 'was to make arbitration agreements as enforceable as other contracts, *but not more so*.'" (emphasis in original) (quoting *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004), *abrogated on other grounds*)).  However, "a party may be compelled to arbitrate a dispute only to the extent he or she has agreed to do so," *Moton v. Maplebear Inc.*, 2016 WL 616343, at *3 (S.D.N.Y. Feb. 9, 2016) (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 569 (S.D.N.Y. 2009)), and "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration

agreements," *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

Section 4 of the FAA provides that "[a]ny party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek "an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). As a result, "[t]he Court's role on a motion to compel arbitration is 'narrow.'" *Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 72302, at *8 (S.D.N.Y. Jan. 6, 2022) (quoting *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 139 (3d Cir. 1998)).

First, the Court must "determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." *Bristol v. Securitas Sec. Servs. USA, Inc.*, 597 F. Supp. 3d 574, 578 (S.D.N.Y. 2022) (quoting *JLM Indus.*, 387 F.3d at 169).

"Courts deciding motions to compel apply a 'standard similar to that applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or

the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need

for further court proceedings." *Id.* (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special*

*Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011)). By contrast, "[i]f there is an

issue of fact as to the making of the agreement for arbitration, then a trial is necessary."

*Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

## II.    Application of the General Standards

First, PEB and PMF agreed to arbitrate. *See* Dkt. No. 28-4 §§ 5.1–5.15.

Second, the claims asserted by Plaintiff are covered by the Arbitration and Dispute

Resolution provision. "When parties use expansive language in drafting an arbitration clause,

presumably they intend all issues that 'touch matters' within the main agreement to be

arbitrated." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225

(2d Cir. 2001). The Arbitration and Dispute Resolution provision is the paradigm of a broad

arbitration clause. PEB and PMG agree to resolve by final and binding arbitration any

"Dispute," "defined in the broadest possible manner," including "any and all claims arising out

of or in any way related to the" MCA agreements, the Security Agreement or the guaranty or the

relationship between PMF and PEB, whether sounding in "contract, tort, or any other theory of

law or equity." Dkt. No. 28-4 § 5.1. The language of "all disputes" "arising under or relating to"

constitutes "the paradigm of a broad" arbitration agreement. *Offshore Expl. & Prod. LLC v.*

*Morgan Stanley Private Bank, N.A.*, 986 F. Supp. 2d 308, 316 (S.D.N.Y. 2013), *aff'd*, 626 F.

App'x 303 (2d Cir. 2015) (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16,

20 (2d Cir. 1995)); *see also JLM Indus.*, 387 F.3d at 172. "Where the arbitration clause is broad,

'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be

ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and

obligations under it.'" *Louis Dreyfus*, 252 F.3d at 224 (quoting *Collins*, 58 F.3d at 23); *see*

*Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at \*15–16 (S.D.N.Y. Sept. 16, 2020).

Plaintiff's RICO claims fall well within the scope of the Arbitration and Dispute Resolution

provision.

Third, RICO claims are arbitrable under the terms of the FAA.  *See Shearson/Am.*

*Express, Inc. v. McMahon*, 482 U.S. 220, 242 (1987); *Khanna v. Am. Express Co.*, 2011 WL

6382603, at \*4 (S.D.N.Y. Dec. 14, 2011); *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 491

(S.D.N.Y. 2008).

Fourth, because both of PEB's RICO claims are arbitrable, the Court need not determine

whether any non-arbitrable claims should be stayed pending the arbitration proceedings.

In sum, under the general standards set out in *JLM Indus*., 387 F.3d at 169, the Court

finds that PEB's claims should be sent to arbitration, absent any consideration of waiver or

equitable arguments against the motion to compel.

## III.    Whether PMF Waived its Rights to Arbitration

PEB argues that PMF and the Individual Defendants have waived their right to arbitration

by filing and prosecuting the State Court Action.  Dkt. No. 29 at 1.  Defendants dispute that

claim, arguing that the terms of the MCA agreements expressly contemplate enforcement of the

contract in state court and proscribe a finding of waiver based on the exercise of that right, Dkt.

No. 34 at 2–3, and further, that they have taken no inconsistent positions by virtue of their

affirmative suit in state court and their defensive posture before this Court, *id.* at 3–8.

Courts sometimes use terms such as waiver and forfeiture interchangeably.  *See Kontrick*

*v. Ryan*, 540 U.S. 443, 458 n.13 (2004).  Here, PEB's argument can be framed in two different

ways.

PEB could be understood to argue that PMF and the Individual Defendants have waived their rights to arbitration within the conventional meaning of contractual waiver. That question must be resolved by the arbitrator.

In *Morgan v. Sundance, Inc.*, the Supreme Court rejected the view that had long been held by the Second Circuit and others that evidence of prejudice is required to find that a party has waived its contractual right to arbitration by litigation conduct. 596 U.S. 411 (2022). The Court concluded that "prejudice is not a condition of finding that a party, by litigating too long, waived its right to stay litigation or compel arbitration under the FAA." *Id.* at 419. The *Morgan* Court stated that generally, waiver is considered to be "the intentional relinquishment or abandonment of a known right." 596 U.S. at 417 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

In the wake of *Morgan*, courts in this Circuit have "adopted a variety of approaches to conducting the arbitration-waiver analysis." *Lawrence v. NYC Medical Practice, P.C.*, 2023 WL 4706126, at *12 (S.D.N.Y. July 21, 2023); *see Brevard v. Credit Suisse*, 2024 WL 36991, at *8–9 (S.D.N.Y. Jan. 3, 2024); *Alvarez v. Experian Info. Sols., Inc.*, 2023 WL 2519249, at *9 (E.D.N.Y. Mar. 15, 2023). Some courts have applied a general contractual waiver analysis pursuant to which waiver can be proved by "undisputed acts or language so inconsistent with [the party's] purpose to stand upon his [or her] rights as to leave no opportunity for a reasonable inference to the contrary." *Lawrence*, 2023 WL 4706126, at *13 (quoting *Kamco Supply Corp. v. On the Right Track, LLC*, 49 N.Y.S.3d 721, 726 (2d Dept. 2017)). Other courts have framed the inquiry as whether the party now seeking arbitration "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right." *Morgan*, 596 U.S. at 419. In a summary order, the Second Circuit continued to treat the amount of time elapsed and amount of litigation

as highly probative indicia of waiver.  *See Nicosia v. Amazon.com, Inc.*, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023) (summary order); *see also Alvarez*, 2023 WL 2519249, at *9.  These factors are relevant because they identify "affirmative conduct or . . . a failure to act" that can manifest a clear "intent to relinquish a contractual protection."  Deng v. Frequency Elecs., Inc., 640 F. Supp. 3d 255, 263–64 (E.D.N.Y. 2022) (quoting *Herrera v. Manna 2nd Ave. LLC*, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022)); *Brevard*, 2024 WL 36991, at *8–9.

Under either formulation, there is no reason why the parties could not determine in advance that the question of waiver, like other procedural questions including delay, laches, and notice, could not be delegated to the arbitrator.  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (holding there is a "presumption . . . that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability") (cleaned up).  Furthermore, there is no reason to believe that an arbitrator would not be fully competent to evaluate PMF's conduct in state court and to determine whether that conduct reflected a clear intent to relinquish its right to arbitrate this dispute.  A federal court has no unique competence to judge whether PMF's conduct in state court evinces an intentional relinquishment of its right to move in this Court to compel arbitration of the claims here.  *Cf. Bell v. Cendant Corp.*, 293 F.3d 563, 570 (2d Cir. 2002) (claim of waiver was properly referred to arbitrator where it was based on an action that pertained to entirely different facts than those at issue in federal lawsuit); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 (2d Cir. 1995) (distinguishing "between cases where the waiver defense was based on prior litigation by the party seeking arbitration—when the court should decide the issue of waiver—and those when the defense was based on other actions" where the question of waiver is for the arbitrator).

Prior to *Morgan*, and even after *Howsam*, the Second Circuit treated waiver by litigation-related conduct, which required a finding of prejudice, as a question for the court and not a procedural question for the arbitrator. *See Bell v. Cendant Corp.*, 293 F.3d at 569; *Distajo*, 66 F.3d at 456; *Meyer*, 868 F.3d at 80–81 ("When the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver"). Moreover, some Judges, including the undersigned, concluded that parties could not "delegate to arbitrators the question of whether, under the judge-made principle of litigation-conduct waiver, a party is barred from asserting its right to arbitration." *Pacelli v. Augustus Intel., Inc*., 459 F. Supp. 3d 597, 614 (S.D.N.Y. 2020); *see also Alvarez*, 2023 WL 2519249, at *28. That opinion was informed by the view that the court alone had both the expertise and the interest in determining whether the adverse party was prejudiced by a delayed motion to compel arbitration and whether court processes had been used improperly. *See Pacelli*, 459 F. Supp. 3d at 615; *see also id.* (stating that waiver-by-litigation conduct "implicate[d] the unique expertise and interest of the courts . . . 'to deal with abusive litigation practices'") (quoting *Distajo*, 66 F.3d at 456 n.12). The undersigned concluded that it could not be otherwise: "if a party, on the eve of trial—or even midway through trial—could in the face of an adverse ruling halt all proceedings and make a spontaneous request for arbitration, it would be no answer to a court concerned with its own docket management to say that an arbitrator will determine the issue of litigation-related waiver (when and if the arbitrator turns to it). The court must have that power." *Id.* If, however, "prejudice" is no longer part of the waiver inquiry and that inquiry turns solely upon whether the party seeking arbitration has intentionally relinquished a known right, there is no longer a principled reason why that question cannot be delegated by the parties to the arbitrator, as an analysis of the "waiver of a contractual right" like "any other." *Morgan*, 596 U.S. at 417.

Accordingly, the Court concludes that PEB's argument that Defendants have *waived* their right to compel arbitration by litigation-related conduct is one that the parties can delegate to the arbitrator.

However, the Supreme Court's decision in *Morgan* suggests a second way to understand PEB's argument. The Court in *Morgan* acknowledged that a party's litigation-related conduct could give rise to questions regarding "waiver, forfeiture, estoppel, laches, or procedural timeliness." 596 U.S. at 416. The Court assumed, without deciding, that the impact of litigation-related conduct on a party's right to arbitrate was best analyzed under the rubric of waiver. *Id.* at 417. But it specifically left open the question whether it was better analyzed under a different "procedural framework." *Id.* at 419. And courts have held that "[t]he concept of waiver by litigation conduct is related to the doctrine of judicial estoppel." *See New Hampshire v. Ramsey*, 366 F.3d 1, 16 (1st Cir. 2004) (regarding waiver of sovereign immunity); *see also Pacelli*, 459 F. Supp. 3d at 614 ("[w]hat goes by the name of 'litigation-related waiver' is in some ways a form of estoppel").

Indeed, some of the Second Circuit's cases, though decided under the moniker "waiver" can be readily reframed as raising a question of judicial estoppel. *See, e.g., Meyer*, 868 F.3d at 81 (claim that defendants actively litigated the lawsuit); *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 626 F.3d 156, 161 (2d Cir. 2010) (plaintiff moved to compel arbitration on eve of "defendants' inevitable motion for judgment on the pleadings"). Sounding in equity, the doctrine of judicial estoppel provides that, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."

*United States v. Swartz Fam. Tr.*, 67 F.4th 505, 519 (2d Cir. 2023) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). "The doctrine applies if 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel." *Swartz Fam. Tr.*, 67 F.4th at 519 (internation quotations omitted). Where a party asks a federal court to exercise its powers and is successful in doing so, it can be said to take a position with respect to the court's authority that it should not be allowed to withdraw when such withdrawal would cause prejudice to the court and the opposing party. *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 620, 623 (2002) (holding that state which "voluntarily invoke[d] the federal court's jurisdiction" could not later assert Eleventh Amendment immunity).[2]

The question of judicial estoppel is for the court. The purpose of judicial estoppel is to prevent "a knowing assault upon the integrity of the judicial system." *Reynolds v. Comm'r*, 861 F.2d 469, 474 (6th Cir. 1988). Whether raised against a private party or a sovereign, the purpose is to "protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749–50 (cleaned up); *see also In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999)

---

[2] In *New Hampshire v. Ramsey*, the First Circuit understood *Lapides* to turn on a question akin to judicial estoppel. *See* 366 F.3d 1, 16 (1st Cir. 2004) ("The concept of waiver by litigation conduct is related to the doctrine of judicial estoppel."). In *Ramsey*, the First Circuit held that even without being formally named plaintiff in an administrative proceeding, a state waived sovereign immunity by "voluntarily put[ting] itself in the position of being a party in a federal administrative forum whose actions would be reviewed in federal court," thereby "express[ing] a clear choice to submit its rights for adjudication in the federal courts." *Id.* "To permit the state to reverse course would contravene the reasons for the doctrine of waiver by litigation conduct recognized by *Lapides* and *Lapides*'s core concern that a state cannot selectively invoke its Eleventh Amendment immunity to gain litigation advantage." *Id.* at 16–17. "The same concerns about unfair litigation advantage underlie the judicial estoppel doctrine." *Id.* at 17.

("[T]he doctrine is intended to project the judicial system, rather than the litigants."); *Lowery v. Stovall*, 92 F.3d 219, 223 n.3 (4th Cir.1996) ("Unlike equitable estoppel . . . judicial estoppel is designed to protect the integrity of the courts rather than any interests of the litigants."); *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process."); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) (judicial estoppel "protect[s] the essential integrity of the judicial process"); *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980) (rule is intended to prevent "improper use of judicial machinery"); *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953) (judicial estoppel prevents parties from "playing fast and loose with the courts" (internal quotations omitted)). "[T]his form of estoppel is less akin to equitable or nonmutual collateral estoppel, and more like concepts of waiver by litigation conduct (e.g., failing to raise an argument at the appropriate time) or sanctions for spoliation of evidence, discovery abuse, or perpetrating fraud upon the court." *Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534, 555 (2005). If, after an adverse ruling, a party who invoked the powers of the court to hear a case suddenly asks a court to stop in its tracks mid-trial by moving to compel arbitration, the court is not powerless to prevent such abuse. The court need not wait upon an arbitrator to protect the court's own processes.

So framed, however, PEB's argument is unavailing. There is no contradiction in PMF's position. PMF cannot be accused of "forum shopping," *see Bell*, 293 F.3d at 569, cited with approval in *Meyer*, 868 F.3d at 81, let alone of "a knowing assault upon the integrity of the judicial system," *Reynolds*, 861 F.2d at 474. PMF has taken a consistent position, which is also consistent with the contract it signed with PEB. It sued PEB in state court as it had a right to do under the MCA Agreements. And PMF has promptly moved to compel arbitration of this case,

the MCA agreements having preserved PMF's right to demand compliance with the Arbitration and Dispute Resolution provision with respect to claims related to the MCA agreements or the relationship between PMF and PEB, *see* § 5.1, notwithstanding any prior decision not to demand compliance, *see* § 5.8.  PMF cannot therefore be accused of perverting the processes of this Court.  It has not asked this Court to take action consistent with the claims before it being litigable, only later to claim that they must be arbitrated.  Nor, indeed, can it be accused of using the State Court Action as a ploy to obtain procedural advantage in the RICO arbitral action.  It did not initiate the RICO action and there is no evidence it was aware that the RICO action would be filed against it.  Whatever advantage it will have in the RICO arbitration from the State Court Action will be the simple and ordinary result of its decision to bring an action against a debtor when that debtor has failed to pay an obligation due.

The cases cited by Plaintiff, to the extent they remain good law after *Morgan*, prove the point.  They are easily distinguishable.  In *Hooper v. Advance Am., Cash Advance Centers of Mo., Inc.*, Defendant filed an "extensive" motion to dismiss which "required the district court to navigate through unchartered territory in Missouri's consumer protection laws."  589 F.3d 917, 919 (8th Cir. 2009).  It was only after the district court had engaged in that exercise, had rejected defendant's  motion to dismiss five of the plaintiffs' claims, and had permitted plaintiff to replead its only additional claim, that the defendant (two weeks later) filed a motion to stay litigation and compel arbitration.  *Id.* at 919–20.  The court found that defendant was seeking to obtain an unfair advantage and that plaintiff would be prejudiced because the defendant invariably would seek in arbitration to "reargue issues upon which the district court ruled."  *Id.* at 923.  In *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, the Seventh Circuit held that a defendant who had removed plaintiff's case to federal court "without at the same time asking the

district court for an order to arbitrate" and who in discovery had obtained "almost two thousand documents" from its adversary while "dragg[ing] its heels in responding to [plaintiff's] discovery demands" could not "for reasons unknown and with no shadow of justification, . . . change[] its mind and decide[] it would be better off in arbitration." 50 F.3d 388, 389–91 (7th Cir. 1995). The court held that the defendant could no longer move to compel arbitration because the facts suggested it "wanted to see how the case was going in federal district court before deciding whether it would be better off there or in arbitration." *Id.* at 391; *see also KenAmerican Res., Inc. v. Potter Grandchildren, LLC,* 916 F. Supp. 2d 799, 801 (E.D. Ky. 2013) (plaintiff engaged in conduct that "smack[ed] of forum shopping" when it filed litigation and moved to compel arbitration only after defendant removed the case to federal court and filed a dispositive motion); *Cent. Tr. Co. v. Anemostat Prods. Div.*, 621 F. Supp. 44, 46 (S.D. Ohio 1985) (defendant moved to compel arbitration only after discovery had been completed, the final pretrial conference had been held, and the case only waited a trial date).

In each of those cases, the effect of the motion to compel arbitration would have been to divest the court that had invested resources in the resolution of a particular dispute of any remaining jurisdiction to resolve the dispute. In the words of the Seventh Circuit, it would have been to permit the party seeking arbitration play a game of "heads I win, tails you lose," allowing it "to see how the case was going in federal district court before deciding whether it would be better off there or in arbitration." *Cabinetree*, 50 F.3d at 391; *see Hooper*, 589 F.3d at 922. In this case, by contrast, PMF has taken no affirmative steps to invoke the powers and resources of this Court other than to seek the instant motion to compel arbitration, nor has PMF engaged in the sort of litigation conduct giving rise to "problems of inconsistency and unfairness" which a court may properly estop. *Lapides*, 535 U.S. at 622.

**IV.    Whether the Individual Defendants Can Compel PEB to Arbitrate**

Lastly, PEB argues that even if it must arbitrate its claims against PMF, it should be permitted to litigate in this Court its RICO claim against the Individual Defendants.  It argues that the motion of those defendants to compel arbitration should be denied for three reasons: (1) PMF's alleged waiver of the right to arbitration is imputed to them, Dkt. No. 19 at 1–2, 16–17; (2) the doctrine of alternative equitable estoppel is inapplicable because PEB does not rely upon the MCA agreements in support of its claims, *id.* at 2, 17–20; and (3) the Individual Defendants have unclean hands, *id.* at 2, 21–24.  None of these arguments have merit.

Arbitration is "contractual by nature," and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  The question whether Plaintiff may prosecute its claims against the Individual Defendants in this Court or whether Individual Defendants are instead entitled to compel arbitration is for the Court.  *See City of Almaty, Kazakhstan v. Sater*, 2019 WL 6681560, at *7 (S.D.N.Y. Dec. 6, 2019), *objections overruled sub nom. City of Almaty v. Sater*, 2021 WL 4940304 (S.D.N.Y. Oct. 22, 2021) (Nathan, J.); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 466–67 (S.D.N.Y. 2018) (holding that "whether [the non-signatory] is to be a party to the [arbitration agreement] is an issue for judicial determination first" where delegation clause "do[es] not mention or reference a particular non-signatory" and therefore "do[es] not clearly or unmistakably evidence an agreement by that non-signatory to have an arbitrator determine whether the agreement is arbitrable" (internal quotations omitted)); *First Am. Bulk Carrier Corp. v. Van Ommeren Shipping (USA) LLC*, 540 F.Supp.2d 483, 485 (S.D.N.Y. 2008) (holding that it

was for the court to decide whether non-signatory defendant, purportedly successor-in-interest to non-party signatory, could compel arbitration against a signatory plaintiff).

As to PEB's first argument, as PMF has not been estopped from its right to move to arbitrate, neither are its employees and agents, the Individual Defendants.

As to PEB's second argument that the Individual Defendants as non-signatories may not invoke the arbitration agreement, that argument fails under traditional principles of contract law, without the need to consider alternative equitable estoppel.

Non-signatories to an arbitration agreement may seek to enforce an arbitration agreement against signatories under the "traditional principles" of state contract law, which include "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed.2001)). The Individual Defendants are undoubtedly third-party beneficiaries under the arbitration provision of the MCAs and, even if they were not, they would be permitted to invoke the provision under a theory of agency.

Under New York contract law, third-party beneficiaries of a contract have a right to enforce its terms when there is a clear intent to benefit the third party on the face of the contract. *See Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 459 (2018); *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605, 612 (S.D.N.Y. 2011), *aff'd sub nom. The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11 (2d Cir. 2012). The MCA agreements identify the Individual Defendants as third-party beneficiaries of the arbitration clause. Under the section heading, "Who May Enforce This Arbitration Provision," they expressly reference "PMF's employees, agents, directors, officers, shareholders, governors [and] managers." Dkt. No. 28-4 § 5.7. Thus,

Plaintiff agreed that the Individual Defendants may enforce the arbitration provision.  The language would be meaningless and Plaintiff's promise illusory if the Individual Defendants could not enforce the arbitration provision.  Plaintiff must be held to the benefit of its bargain.  *See Catz v. Precision Glob. Consulting*, 2021 WL 1600097, at *12–13 (S.D.N.Y. Apr. 23, 2021) (allowing third party to invoke arbitration provision under N.Y. law); *Bakon v. Rushmore Serv. Ctr., LLC*, 2017 WL 2414639, at *3 (E.D.N.Y. June 2, 2017) (same).

In any event, Plaintiff is bound to arbitrate against the Individual Defendants under conventional principles of agency law as applied to arbitration.  *See Clarke v. Alltran Fin., LP*, 2018 WL 1036951, at *6 (E.D.N.Y. Feb. 22, 2018) (Bianco, J.) ("Under the FAA, 'traditional state law principles' may be used by non-signatories to enforce arbitration agreements. . . Courts have consistently recognized agency law as one such state law principle" (quoting *Andersen*, 556 U.S. at 631)); *see also Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 668 (2d Cir. 1997) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." (quoting *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993), *cert. denied*, 510 U.S. 945 (1993))); *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 37 (1st Cir. 2017) (collecting cases).  "The rule is necessary not only to prevent circumvention of arbitration agreements but also to effectuate the intent of the signatory parties to protect individuals acting on behalf of the principal in furtherance of the agreement."  *Hirschfeld Prods., Inc. v. Mirvish*, 673 N.E.2d 1232, 1233 (N.Y. 1996).

Specifically, "agents of a signatory can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents and (2) the claims against the agents arise out of or relate to the contract

containing the arbitration clause (consistent with the language of the arbitration clause)." *Clarke*, 2018 WL 1036951, at *6 (quoting *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 832 (N.D. Cal. 2007) (collecting cases)); *see, e.g., Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 11 (1st Cir. 2014) ("[A] number of our sister circuits have addressed this issue, and all have held that an agent is entitled to the protection of her principal's arbitration clause when the claims against her are based on her conduct as an agent.").

On the face of PEB's complaint, it is clear that the Individual Defendants are being sued in their capacity as agents of PMF.  Individual Defendants Kashat, Gieselmann and Bejko are each "employees" of PMF.  Compl. ¶¶ 3–5.  Kashat is the "Managing Director" of PMF, Gieselmann is a "Director" of PMF, and Bejko is a "Senior Credit Analyst" for PMF.  *Id.* ¶¶ 203–204, 209–210, 215–216.  In its characterization of the Individual Defendants as RICO "persons," PEB alleges that each is responsible for the day-to-day operations of PMF and has decision making authority with respect to the underwriting, entry into, and financing of the MCA Agreements that PMF entered in with PEB.  *Id.*  The basis of the Complaint is the interest charged by PMF on its contracts with PEB, not any conduct that Individual Defendants took in their individual capacities.  Because the Complaint alleges that the Individual Defendants' misconduct "relates to behavior as officers or directors or in their capacities as agents of the corporation," the Individual Defendants may "use the arbitration provision as a sword to compel arbitration, which is to say, a shield against litigation before a court."  *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co*., 2015 WL 144190, at *7 (S.D.N.Y. Jan. 12, 2015); *see also* Domke on Commercial Arbitration § 13:3 (3d ed. 2014) ("To the extent that a suit alleges misconduct that relates to behavior as officers or directors or in their capacities as agents of the corporation, the courts have consistently afforded agents the benefit of arbitration

agreements entered into by their principals."). If they were not able to do so, PEB could circumvent the arbitration clause in any case of a dispute with PMF simply by the expedient of suing its officers for the conduct that gave rise to the dispute.

PEB argues that the Individual Defendants may not invoke the MCA arbitration provision because PEB's RICO claims do not rely upon the MCA agreements. PEB urges that its RICO claims "exist independent of the validity of the Agreements," Dkt. No. 29 at 19, because its "claims allege that the Agreements are unenforceable due to illegality, i.e., the collection of an unlawful debt in violation of 18 U.S.C. § 1962, et seq.," *id.*, "nowhere in the Complaint are PEB's claims tied to obligations contained in the Agreements, and PEB's claims exist even if this Court were to find the Agreements void and unenforceable," *id.* at 20, and in fact, "PEB's claims are premised on the invalidity and unenforceability of the Agreements," *id.* Those arguments are as unavailing against the Individual Defendants as they would be against PMF. As noted above, the arbitration clause here is not limited to those disputes that arise under the MCA agreements. The arbitration clause is broad. It sweeps in "any and all claims or controversies arising out of or in any way related to this [MCA agreement] or the relationship between PMF and Merchant, whether arising from or relating to the Agreement itself, or arising from alleged extra-contractual facts prior to, during, or subsequent to the Agreement, and whether those claims [sic] grounded in contract, tort, or other theory of law or equity." § 5.1. That language is capacious enough to include RICO claims. *See Roby*, 996 F.2d at 1360 (holding that agency principles applied to require arbitration of RICO and federal securities law claims against non-signatories); *Shearson/Am. Exp.*, 482 U.S. at 242 ("[W]e find no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims."); *Khanna*, 2011 WL 6382603, at *4.

PEB is not helped by its argument that the MCA agreements are unenforceable and that its claims would stand even if the agreements were void. A similar argument could be and has been made in every circumstance where a party seeks to compel arbitration of a claim of fraud in the inducement. The Supreme Court has held that the fraud or wrongdoing that relieves a party of its obligations under an arbitration provision must be fraud or wrongdoing in connection with the arbitration provision. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."); *Buckeye Check Cashing*, 546 U.S. at 446–47 (claim that a purportedly usurious contract containing an arbitration provision was void for illegality was to be determined by arbitrator, not court, where claim challenged contract as whole, not arbitration provisions in particular); *Rubin v. Sona Int'l Corp.*, 457 F. Supp. 2d 191, 193 (S.D.N.Y. 2006) ("*Buckeye Check Cashing* makes clear that whether [plaintiff] argues that the agreement is void or voidable, [plaintiff] may only avoid arbitration if it can successfully challenge the validity of the arbitration clause itself."); *Convergen Energy*, 2020 WL 4500184, at *4. Fraud or wrongdoing in connection with the agreement as a whole or in respect of a provision other than the arbitration provision does not permit such relief. Indeed, as much is made clear from the face of the MCA agreements. They contain survival clauses, pursuant to which even if some parts of the MCA agreements may be considered to be invalid, the others— including the arbitration clause—remain valid and enforceable. *See* § 5.8 ("If any part of this Arbitration and Dispute Resolution is held invalid the remainder shall remain in full force and effect."); § 4.8 ("In case any of the provisions in this Agreement is found to be invalid, illegal. or

unenforceable in any respect, the validity, legality, and enforceability of any other provision contained herein shall not in any way be affected or impaired."); § 4.9 ("Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.").

Finally, PEB's argument that Individual Defendants are barred from reliance on equitable estoppel on the basis of "unclean hands" does nothing more than restate in different words its claim that it should not be required to arbitrate its dispute with those defendants because the underlying MCA agreements are wrongful and Defendants have violated RICO.  But Plaintiff unambiguously agreed to arbitrate RICO claims in the MCA agreements.  It may succeed in its argument that the Individual Defendants have violated RICO, but that is a question for the arbitrator—the Court cannot and does not express an opinion on the merits.[3]

---

[3] In pressing its argument, PEB relies on the statement in *Doe v. Trump Corp.*, that where "the non-signatory is alleged to be a third-party wrongdoer as it is here, we have made clear that the arbitration contract 'in no way' extends to the non-signatory."  6 F.4th 400, 413–14 (2d Cir. 2021).  However, the court in *Doe* was merely re-stating the rule that equitable estoppel is not available to third party co-conspirators who do not have a close relationship with the signatory corporation.  *See id.* at 413 ("[O]ur 'cases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities.'" (quoting *Ross*, 547 F.3d at 144)).  Here, the Individual Defendants are not alleged to be mere co-conspirators.  Rather, they are alleged to be directors, officers, employees and agents of the signatory to contracts that, by their terms, extend arbitration rights to them by reason of their formal roles with PMF.

**CONCLUSION**

Defendants' motion to compel arbitration and for a stay of these proceedings is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 26.


SO ORDERED.

Dated: July 1, 2025
     New York, New York

                                      LEWIS J. LIMAN
                              United States District Judge